## *Ex parte* JENNINGS.

A patent or grant of land by the state, bounded on the margin of a river above tide water, carries the land to the grantee *usque filum aquæ*.

Otherwise, where it is bounded on a navigable river.

A navigable river, in the common law sense of the term, is only where the tide ebbs and flows.

A patent or grant of land was bounded on the *margin* of the *Chitteningo* creek; held, that it carried the land to the grantee, *usque filum aquæ*.

BEFORE, and at the time of the erection of the Erie canal, the relator was in possession, and claimed to be the owner in fee of various *hydraulic* works, standing on the margin of the *Chitteningo* creek, near the rapids, in the town of *Sullivan*, in the county of *Onondaga*. He had, before the erection of the canal, purchased the land on which the works stood, bordering on the creek, with about 200 acres of adjoining land. The works consisted of a flouring mill, two saw-mills, one carding-machine, and one clothier's works, which he claimed to be worth about $10,000 ; and which were dependent for their operation on the waters of the *Chitteningo* creek. Being so possessed, about five years ago, this creek, with its main tributary branches, the *Cowassalon* and *Butternut*, above the relator's works, were taken into the Erie canal for a feeder. *Limestone* creek, which also formed a junction with the *Chitteningo*, above the relator's works, was likewise taken into the canal as a feeder in the fall of the year 1825. All the principal streams which formed the *Chitteningo* creek, where the relator's works are situated, are now made use of as feeders to the Erie canal. This canal

The water of the *Chitteningo* creek was diverted from a mill and other hydraulic works on that creek ; the right to erect the works being claimed under a patent or grant|from the state, bounded *on the margin of the creek* ; *held*. that the appraisers appointed pursuant to the act, (*sess.* 43, *ch.* 275, *s.* 1,) were bound to appraise the damages to the owners of the works, they having a right to erect them, and a right to the use of the waters ; that this was a case within the statute, (*sess.* 40, *ch.* 262, *s.* 3.)

The appraisers having refused to act, on the ground that the property of the creek was in the state ; and that, therefore, they had no jurisdiction ; *held*, that a mandamus should issue commanding them to appraise.

The court granted a peremptory *mandamus*, on the first motion, the case being argued on both sides ; and the court understanding that the appraisers were willing to abide by the decision on the facts as they then stood ; but afterwards, on suggestion that the appraisers wished to bring error, they changed the rule into one for an alternative mandamus ; so that the facts might be put on record by a return.

was erected by the state, which, since thus converting the waters of the *Chitteningo* to the purposes of the canal, has used the surplus water either for its own use for the benefit of the salt works works at *Salina*, or disposed of it to individuals for the purpose of hydraulic works, they paying an annual revenue to the state for its use. By these operations, the relator's works have become nearly useless for the want of water.

About four years ago, he applied to the canal commissioners; and requested them to appraise his damages arising from thus diverting the water from his mills, pursuant to the statute, (*sess.* 40, *ch.* 262, *s.* 3, 4 *Laws*, 302, *b;* and *sess.* 44, *ch.* 240, *s.* 1, 5 *Laws*, 248, *c,*) but they neglected to make the appraisal. In the summer of 1825, after the passing of the act, (*sess.* 48, *ch.* 275, *s.* 1, 7 *Laws, p.* 398, *a,*) constituting a new board of appraisers, he made his application to them for the same purpose, which he repeated several times last winter, giving them notice in writing. This board consisted of *Henry Seymour*, *David Woods*, and *Joseph D. Selden*, Esquires.

On the 10*th* of *July* last, he laid before them his claim for damages; but they absolutely declined, and refused to make any appraisal, or to act upon the subject, or allow him any compensation whatever.

On the relator's affidavit showing these facts,

*S. L. Edwards*, moved for a mandamus, commanding the appraisers to proceed and make an appraisal in the premises.

*S. Beardsley*, contra, read an affidavit of Mr. *Henry Seymour*, one of the canal commissioners, and a member of the board of appraisal to whom *Jennings* had submitted his claim for damages, stating that the appraisers, against whom this motion was made, in their consultations upon *Jennings'* application, all agreed, as he understood, and now believes, that in point of fact, the state had not parted with the land upon which the *Chitteningo* passes, at the place claimed by *Jennings*; but had bounded purchases of land *on the margin of the stream;* so that, as he

believes, (and he believes the other appraisers were satis-
fied of the fact being so,) the state was still the owner of
the land covered by the waters of the stream ; and had not
parted with it, or contracted to part with it, to any person
whatever ; or authorized the use of the water of the stream
for hydraulic purposes at the place in question.

A similar application was made by *N. P. Randall* in be-
half of *Eglestone*, who claimed about 5000 dollars for dam-
ages from the same cause mentioned above in *Jennings'*
case.    The only difference was, that *Eglestone* had taken
possession of the premises in question on his part, under
a contract for a conveyance in fee, but which was not yet
executed.

And now both motions were heard together.

*Edwards* and *Randall*, in support of the motions.  The
appraisers refuse to act, alleging that they have no juris-
diction.    This objection is partly technical, as founded on
the construction of their powers under the act ; but main-
ly, because they claim the premises in question as the
property of the state.

1. Suppose the bed of the creek never to have been
granted by the state :  can they divert the water from
land owned by an individual, extending *only to the mar-
gin?* We contend not.   The rule of law is *aqua currit,
et debet currere.*  Water flows in its natural course, and
should always be permitted to run there ; so that all
through whose land it passes may have the privilege of
using it ; but not so as to injure another.   (*Angell on
Watercourses*, 5.  *Merritt* v. *Parker, id. App.* 134.)  The
right to the use of water flowing *by a man's land,* belongs
to the owner of common right.   (*Co. Lit.* 261, *a.  May-
or of Hull* v. *Barnes, Cowp.* 102.)   A man possessing
land on the banks of a river, has a right to the flow of the
water in its natural stream, without alteration or diminu-
tion.   (*Bealy* v. *Shaw*, 6 *East*, 208, *per Graham, B.
at N. P. whose doctrine was recognized and affirmed on
motion for a new trial.*)

Though *Jennings* does not own lands on both sides of the stream, his right is perfect, to have the water flow by and *along* the side of his land. (*Angell on Watercourses*, 29. *Co. Lit.* 261, *a*. *Cowp*. 102.)

But a grant bounded on the margin of a fresh water creek or river, carries the land to the centre of the stream. It is well settled that fresh rivers, of what kind soever, do. of common right, belong to the owners of the adjacent soil. (*Angell on Watercourses*, 15. *Palmer* v. *Mulligan*, 3 *Caines' Rep*. 319. *Dav. Rep*. 152, 155, 157. 12 *Mod*. 510. 17 *John. Rep*. 195. 2 *Conn. Rep*. 481. 20 *John. Rep*. 99. 4 *Burr*. 2162.) Where one owns the soil under the water of a running stream, the right to the water course extends not to the fluid itself; but only to the advantage of its impetus. (*Angell on Watercourses*, 37, 39.) Where a creek not navigable, and which is beyond the ebb and flow of the tide, forms a boundary, the line must be run in the centre. (*Jackson* v. *Louw*, 12 *John. Rep*. 252, *per Yates, J.*)

We concede that the soil of the sea, and the soil where the tide ebbs and flows, between high and low water mark, belong to the public. (*Co. Lit*. 261, *a*. 2 *Bl. Com*. 262.)

Private rights are not to be impaired by the state, unless a compensation is provided. (*Angell on Watercourses*, 53, 4. *Gro. b*. 8, *c*. 14, *s*. 7. *Puf. b*. 8, *c*. 5, *s*. 7. 1 *Bl. Com*. 141. 2 *John. Ch. Rep*. 162.) If no compensation be provided, an action lies for the injury. (*Angell on Watercourses*, 65, 6, *and the cases there cited*. *id*. 53, 4, *and the cases there cited*.)

*S. Beardsley*, contra. The appraisers suppose they had no jurisdiction of the matter in relation to which they were called upon to act. The act of the 15*th* of *April*, 1817, prescribes their power, and lays down the principles of appraisal. (4 *Laws N. Y.*, 302, *b. s*. 3.) The canal commissioners are authorized by this section, to take possession of "any lands, waters and streams," necessary for the prosecution of the canal; and in case these are not granted to the state, there is to be a just and equitable

appraisal *of the loss and damage, if any, over and above the benefit and advantage to the respective owners and proprietors, or parties interested in the premises so requir-ed.* And whether any damages are awarded or not, they are to describe the premises appropriated. The act of the 7th of *April,* 1819, section 3, (5 *Laws N. Y.* 123, *a.,*) extends the same principles to other parts of the canals. The subsequent acts do not alter the principle. The on-ly change made, is in the board of appraisal. The 2d sec-tion of the last act, (*April,* 20, 1825, *Laws N. Y.* 398, *a,*) gives an appeal from the board of appraisers to the canal commissioners, whose decision shall be final.

The appraisers cannot act, unless it be in relation to such "lands, waters or streams," as may be given or granted to the people. And these must be such as some person may own, or in which they may have an interest. Besides; they must be property, the fee simple of which may vest in the state. For, on appraisal and payment, such is de-clared to be the consequence.

Water does not admit of ownership. The interest in it is merely usufructuary. It belongs to the first occupant only while he holds possession of it. (2 *Bl. Com.* 14, 18.) The fee simple cannot be vested in the state. No descrip-tion can be made of it.

*Eglestone* has no legal interest; but merely a contract for a deed; and though *Jennings* purchased and has a deed, it does not appear of whom he made his purchase. A clear title should be made out; such an one as will be worth something to the state.

I am directed to insist that the *Chitteningo* is a public stream; that it is public property in every sense of the word; and the state has title to the lands upon which it passes, the patents being bounded upon the margin of the stream, and not at its centre.

Rivers are of three kinds. 1. Such as are wholly and ab-solutely private property. 2. Such as are private proper-ty, subject to the servitude of the public interest by a pas-sage upon them. The distinguishing test between these two is, whether they are susceptible or not of use for a

common passage. 3. Rivers where the tide ebbs and flows, which are called arms of the sea. (*People* v. *Platt*, 17 *John.* 211. *Hooker* v. *Cumming*, 20 *John.* 90. 4 *Burr.* 2164, *per Lord Mansfield.*)

In the second kind, the public have the right of way; and where the river is not granted in terms, it should not be holden to pass. A boundary *upon* the margin excludes it. The use of these large streams are important to the state in various ways; and it never was the intention to part with the right of appropriating them to the use of the public. Individuals enjoy the benefit of them at sufferance from the state.

This is a question of great importance, not only to individual owners and the state, but to the canal commissioners. Probably more than $100,000 on the lines of the canals, are involved in its issue. If the canal commissioners pay out money, on appraisals where there is no jurisdiction, the act is void; and they are amenable to the state. They are therefore bound, in duty to themselves, in a doubtful case, to avoid appraisals; and especially to avoid payment till the decision of this court can be had, which they are very willing to follow. Mr. *Seymour*, at whose request I now raise these questions, is anxious fully to indemnify these suffering individuals, if he is warranted in doing so; and will most cheerfully follow the directions of this court.

I am not directed to raise the question here, as to the constitutional power of the legislature, to proceed in this manner: first to take private property, and then to appoint their own agents, dependent upon themselves, to make the appraisal. But I have certainly very serious doubts, whether the decision of judge *Patterson*, in *Van Horne's lessee* v. *Dorrance*, (2 *Dall.* 313, &c.) that they are bound to do this through the medium of the ordinary tribunals of the state, is not according to the law of the case. Should this court think the board itself unconstitutional, of course they will not interfere and compel an appraisal by mandamus.

Besides, the appraisers have a discretion. They are to exercise their judgment whether any damages are due,

ALBANY,
Oct. 1826.

Ex parte
Jennings.

over and above the benefit which the individual derives from the canal. They may have proceeded on this ground. If so, this court certainly will not control or coerce them by mandamus. (19 *John.* 262. 12 *John.* 415. 2 *Cowen*, 444.)

*Randall*, in reply. It is true, on the authorities cited, that this court will not interfere by mandamus where the inferior tribunal has a discretion, and has acted on that discretion. Here is an utter refusal to act at all; and, moreover, the ground is stated on which that refusal is founded. This is the very case, of all others, in which the court should interfere; a case where there is no other legal remedy. Such is the language of the cases cited to this point. The appraisers have been pressed to act again and again. They have uniformly refused. The legislature have been applied to. They refused to act, on the ground that the case is a proper one for appraisal.

It is true, that running water, as such, is not strictly the subject of property. But if we have no property in it, neither have the state. The property in water depends on the ownership of the soil *through* or *by* which it flows. Though there cannot be a grant of water *eo nomine*, the right to use it may be granted, in fee, or for any lesser time. The act should be liberally construed in favor of individual right. If there be no provision for indemnity, the commissioners are wrong doers; and are liable to an action. It is not to be supposed that the state will take the property of any individual without providing the means of paying him for it.

It is enough that the applicants are in possession of the premises in question. The appraisers must satisfy themselves of the extent of their interest, pay them for it, and it then passes to the state, whatever it is. What we complain of is, that they refuse to pass upon the subject; claiming the whole for the state.

It is certainly due to Mr. *Seymour*, to say that he is not only willing, but anxious to allow these applicants an indemnity, provided he can feel himself warranted in doing

so.  We do not know the views of the other gentlemen who compose the board ; but we presume they are also anxious that justice should be done ; and that it is delayed only by an apprehended want of authority.

*Curia.*  By the third section of " An act respecting navigable communications between the great western and northern lakes and the Atlantic ocean," (*sess.* 40, *ch.* 262,) the canal commissioners are authorized to take possession of, and use any " lands, *waters and streams*," necessary for the prosecution of the improvements intended by the act ; and, by the same section, the commissioners of appraisal are " to make a just and equitable estimate and appraisal of the loss and damage, if any, over and above the benefit and advantage to the respective owners and proprietors, or *parties interested* in the premises so required, &c., by, and in consequence of making and constructing any of the works aforesaid."  It is admitted that the principles of appraisal have not been changed by any subsequent act.

In this, and the subsequent act, there is ample provision, we think, for allowing compensation for all damages to private property occasioned by the canal commissioners in the prosecution of their duties, whether such damage be direct or consequential.   *Waters* and *streams* in which the relators claim an *interest*, are taken for the use of the canal.   It is a case within the very words of the act.   If not so, if it were a question of construction, there can be no doubt that such construction should be most liberal in favor of private right.   Individual property cannot be taken ; or, which is the same thing, individual rights impaired, for the benefit of the public, without just compensation.   Such is the language of the common law, and of the constitution.   It would be derogating from the justice of the legislature, to suppose they would stop short of providing for compensation in such a case.

Whatever interest the claimant of damages may have, he is to be paid for ; and the state then succeeds to his right.   The state becomes a purchaser.  True, the same

section which provides for the appraisal, &c., says this acquisition shall be in *fee simple ;* but this may well be, though the individual claimant may have only a limited interest, a particular estate, for instance ; or a right merely equitable, the reversion or legal estate residing elsewhere. If so, when the whole shall be paid for, the whole will vest in the state. The question as to the extent and value of interest, is one for the appraisers ; and respects the amount of damages, and the persons to whom they are to be paid. We see no more difficulty in describing and entering in a book the various interests which different persons may have in the flow of water, whether immediate, reversionary, legal or equitable, than in designating the like interests in land. It cannot be allowed, because the estate is less than a fee, or because it is merely incidental to, or issuing out of land, that, therefore, the owner should be divested of his right without compensation. The right to the flow of water over land, is commensurate with the interest in the land. It many times constitutes the main value of the property ; and is accordingly made the subject of compensation and acquisition by the very terms of the statute. A conventional transfer of such a right, by grant, would, no doubt, be valid.

There can be no doubt that a mandamus is the proper remedy. This is not the case of error in the act of appraisal ; but the commissioners have refused to make any appraisal whatever. This is not denied ; and a mandamus is asked for, commanding the appraisers to proceed, and value the interests of the relators at what they are worth.

So much as to the preliminary objections. These were considered by the counsel, and are, indeed, of minor consequence, compared with the question of right ; which is put by the appraisers on the construction to be given to the state grant of the lands bordering on the *Chitteningo.* The objection is contained in the affidavits of Mr. *Seymour,* " that, in point of fact, the state had not parted with the land upon which the *Chitteningo* passes, at the places claimed, but had bounded purchases of land *on the margin of the stream ;* so that, as he believes, (and he be-

lieves the other appraisers were satisfied of the fact being so,) the state was still the owner of the land covered by the waters of the stream, and had not parted with it, or contracted to part with it to any person whatever ; or authorized the use of the water for hydraulic purposes at the places in question."

If the construction set up by the commissioners be the true one, if the state owns the land covered by the water, it is clear that, though the relators may be entitled to the use of the water flowing by, and touching upon them for all ordinary purposes, yet they cannot build mills upon, and raise the water of the stream. They are trespassers ; and the state may claim not only the water, but the mills themselves, so far as they encroach upon the stream.

We do not, however, entertain a doubt that the appraisers have misapprehended the construction of the state grants. It is not pretended that the *Chitteningo* is a navigable creek or river, where the tide ebbs and flows. Such is notoriously not the fact. The decisions upon the construction of grants, bordering on streams, are numerous in the reports, not only of this, but of other states, and of *England;* and, so far as they proceed upon the common law, they are uniform. The cases have generally arisen upon disputes concerning the rights of fishery ; and though relating to rivers of the first magnitude, where the public have an acknowledged right of passage for rafts, boats, &c., yet the owners of land on the margin, above tide water, have been allowed the several and exclusive right of fishery to the centre of the stream opposite their respective farms ; and where their land lies on both sides, they have been allowed the same right in the whole river, so far as their farms extend.

It is not necessary to go into the various cases on this subject. They were mostly cited upon the argument. They proceed upon the principle that the owner of the land on the margin, owns the bed over which the river passes ; and though it be nominally and in terms bounded on the margin, it extends, by construction of law, to the centre of the stream. The public right is one of passage,

and nothing more ; as in a common highway.   It is called by the cases an *easement ;* and the proprietor of the adjoining land has a right to use the land and water of the river in any way not inconsistent with this easement.   If he make any erection rendering the passage of boats, &c. inconvenient or unsafe, he is guilty of a nuisance ; and this is the only restriction which the law imposes upon him.   It follows, that neither the state nor any individual have a right to divert the stream, or render it less useful or valuable to the owner of the soil.   If the state had intended to retain the property in the stream, they should have inserted an express reservation or exception in their grants.

An opposite rule prevails in the construction of grants bounded on the margin of navigable rivers.   By the term *navigable river,* the law does not mean such as is navigable in common parlance.   The smallest creek may be so to a certain extent, as well as the largest river, without being legally a navigable stream.   The term has in law a technical meaning ; and applies to all streams, rivers or arms of the sea, where the tide ebbs and flows.   A public grant, bounded on the margin of such waters, extends by construction no farther than high water mark, and leaves, as to the rest, an absolute proprietary interest in the public.   Above the flow of the tide, the river becomes private, either absolutely so, or subject to the public right of way, accordingly as it is a small or a large stream.

In this case, we decide that the grant, as set forth by Mr. *Seymour,* carried the land to the middle of the creek ; and that, therefore, the interest is out of the state.   We think the relators have shown an interest which entitles them to an appraisal ; and it is for the appraisers to determine its extent, on the hearing before them.

Rule for a peremptory mandamus.

The above arguments and decision were at *August* term last.

The following rule was entered in the case of *Eglestone :*

ON reading and filing the affidavit of *Darius Eglestone*, showing that he is in possession of a lot of land and mill, situated on the *Chitteningo* creek, in the town of *Sullivan;* that the water has been diverted from the said creek for the use of the *Erie* canal; that he has made application to *Henry Seymour, David Woods* and *Joseph D. Selden*, to estimate and appraise the damages which the said *Darius* has sustained on occasion of the diversion of the said creek; and that the said appraisers refuse to make any appraisal or estimate of said damages; and on reading and filing the affidavit of *Henry Seymour*, explaining the reasons why the said appraisers refuse to appraise and estimate said damages; on motion of Mr. *N. P. Randall*, and the same being argued by him on behalf of the relator, and by Mr. *Beardsley* on behalf of the said appraisers; and it appearing to the court that the said *Darius* has an interest in the premises, which entitles him to an appraisement of damages, if any have been in fact sustained; it is, therefore, ORDERED, that a mandamus issue, to be directed to the said *Henry Seymour, David Woods* and *Joseph D. Selden*, commanding them to proceed to appraise and estimate the damages of the said *Darius Eglestone*, on occasion of the taking of the waters of the said creek for the use of the *Erie* canal, over and above the benefit and advantage to the said *Darius*, by and in consequence of making and constructing the said canal.

A similar rule was entered in the cause *ex rel. Jennings.*

During the last vacation, on the application of Mr. *Beardsley*, in behalf of the canal appraisers, the CHIEF JUSTICE granted an order to stay proceedings in the cause, in order that there might be a re-argument; and that, at least, the court might be moved to vacate the rule for a peremptory mandamus, and to grant one for an alternative mandamus only, so as to bring the question more fully and solemnly before them on the return of the appraisers.

A motion was now made accordingly.

*Talcott, (attorney general,)* for the motion. So far as the merits of the question are concerned, there is but

one ground on which a mandamus can be claimed. That is, that these relators had such an interest in the water diverted as to be damnified. With deference, it would seem to me that the relators are precluded from taking that ground, by the fact that the appraisers did consider and decide upon the claim. They went into the merits; and *held* that the grant of the state being bounded on the margin of the creek, would not carry its bed to the original grantees; that, therefore, the relators could have no interest. Besides; as to *Eglestone*, he pretends no legal interest. The relators should have taken their remedy by appeal.

That a party may convey to the margin of a stream, without conveying *ad filum aquæ*, is settled by the case of *Jackson* v. *Halstead*, (5 *Cowen*, 216.) If this may be so, the relators are bound to shew clearly and particularly, why it was not so in their case. They should set forth the grants, in order that it may be seen whether their claim is justified in the full extent to which it is preferred. We insist that the boundary stopped at the margin. We can do no more; and this is all that should be required of us. We cannot show the deeds. It is not competent for the relators to infer from the words which we use, that the grant extends beyond the margin. Omitting to produce their title, every inference should be made against them.

What *Eglestone's* contract is, does not fully appear. It is evidently but an executory contract, and passes no legal title. It may have been forfeited; and all equitable title gone.

*Randall* and *Edwards*, contra. This is the first time we have heard that the appraisers have made any adjudication. It was not pretended on the former argument. We state in our affidavits that the appraisers had refused to act; and the contrary is not pretended by the affidavit of Mr. *Seymour*. So far from this, we understand him as ingenuously admitting that the appraisers had refused to adjudicate. We asked a mandamus compelling them to

make a judicial decision, from which we might appeal, if it should not be satisfactory. This was granted, and is now sought to be set aside or qualified, without any new facts being shown.

The relators are in possession. This is, *prima facie,* evidence of title. It gives them the right to an appraisement according to their interest. The statute is broad in its terms : and extends to all persons who are injured. The decision of the court at the last term, went upon the boundary, as set up by *Seymour* himself. They held that a boundary on the margin, carried the grantee to the centre of the river. *Jackson* v. *Halstead*, cited by the attorney general, has no more application to the point before the court, than any other case which he might have cited. The question was, whether the words "including the same," (i. e. *the river,*) used in a grant, would pass the bed of the river, or only a right of fishery. Clearly the words would not pass the soil. Neither the case, the counsel, nor the court, lisped a word as to the operation of a grant bounded on a river. Not an authority was cited to this point. It turned entirely on the construction of the words used in describing the subject matter. Because the question now before the court might have arisen, does it follow that the well settled doctrine of the common law is to be overturned ? A doctrine to which we before cited many authorities, and against which not one common law authority has been or can be found. We say common law authority ; because we except the cases in *Pennsylvania.* They reject the common law, which this court is not authorized to do. We now add other authorities to the point, that where one owns the land on a river above tide water, he owns the river itself on his side, *ad filum aquæ.* (*Lord Fitzwalter's case,* 1 *Mod.* 105. *Carter* v. *Murcot,* 4 *Bur.* 2162. *Rex* v. *Smith, Doug.* 444. 2 *Rol. Abr.* 170, *pl.* 14. 15 *John.* 454, *per Platt, J.* *Hayes' Exr.* v. *Bowman,* 1 *Randolph's Virg. Rep.* 417. *Claremont* v. *Carlton,* 2 *N. H. Rep.* 369.) A watercourse does not depend on prescription ; but is *ex jure naturæ.* (3 *Bulstr.* 340. 1 *Wils.* 174.)

Where grants are made, like those upon this creek, for 12 and 20 miles along the stream, to deprive the grantees of the water, would be a fraud upon the subject. The original purchases and settlements were made, and a consideration paid to the state, on the faith of the various benefits to be derived from using the waters of this stream. High prices have been given by subsequent purchasers with a view to the same privileges. These constitute the main value of the land. If there was an intention in the state to reserve the stream, an express reservation or exception should have been inserted; or the intention in some other way made known to the purchaser. He takes under boundaries terminating *at the creek* or the *margin of the creek*. The meaning of the parties is the same. It is, that the grantee should have the benefit of the stream. Wherever his grant touches the water, the common law gives him a right to the stream, subject in some cases to a right of passage; but not so in this case. The *Chitteningo* is an inconsiderable creek, hardly navigable for small boats at the place in question. The state might as well claim every insignificant stream within its borders, on the ground of some equivocal words in the grant. The doctrine of *Hargrave*, cited on the former argument, is the law of this state. It has been recognized by repeated decisions of our courts. If the grant of a party touches a stream above tide water, he owns of common right to the centre.

It is idle now to talk of our having no right. The appraisers do not place themselves on a defect in our title. They set up a claim in the state. This is the open and avowed ground, under the oath of Mr. *Seymour*. They do not mean to allow any one damages for subverting these valuable mills and mill privileges. Why did they not enter into an inquiry as to the title? If it is not in the relators, it is in some other person or persons, and damages are due somewhere. No. This valuable property has been converted to the use of the state. The state derives a revenue from rent of the surplus waters to about $1000 *per annum*; and yet the true owners are set at defiance.

The appraisers would have had no difficulty, if the title be not in us, in finding it to be in somebody whom it is their duty to pay. We need not produce our deeds here. Title is a question before them. We are in possession. If that possession has been rendered valueless to us for only *three days*, instead of more than that number of years, as is the fact, we have sustained some damages for which we are entitled to an appraisement.

But suppose all authority is to be overturned; and that we are to be restrained to the *margin*, the nominal boundary, according to the terms of the grant as set up by the appraisers; still we touch the stream; and if the state own the bed, they have no right on that ground to divert the water. It takes its course from nature; and though it runs over the land of another, he has no right to divert it. This was abundantly shown by authorities cited on the former argument. It is a new refinement, to say that a grant bounded *on the margin of the creek* does not touch the creek.

*Talcott*, in reply. I shall never appear before this court, or any other, to advocate a doctrine which would operate as a fraud on purchasers. When the state desire this, they must seek some other instrument. But I feel bound to resist all claims upon the public not founded in right. I admit that, whether the relators shew a right to the land under the water or not, they are entitled to some compensation, provided they make out a right in themselves to the land adjoining the water. The state has no more right to divert the water than an individual; and if these relators own the land under the water, then clearly they are entitled to full damages. The question is, how they are to show their right? If the inquiry had been before a jury, they must have established their claim by a proper deduction of title, or other proof of their interest. And if this be a case in which all that we can require of the parties is, to make their own affidavits; and they omit to set forth their boundaries; is it not to be inferred, that had they

been set forth, they would have excluded the stream? Is not every presumption to be against them? If an exception or reservation be necessary to exclude the stream, is not this to be presumed? If there may be any case in which they would fail of a right to the centre of the stream, is it not to be presumed? If the grants were produced, there might be an exception. If the proof here produced is to be sufficient; no matter what the boundary; every one bounded on a stream, whether there be an exception or not, will obtain damages.

I said the appraisers have made a decision; and am answered that there was no adjudication. What is there lacking to a complete adjudication? An application was made to the appraisers; and on what was heard, they decided against the claim. The affidavits of the relators complain that they refused and did not appraise. And they ought not, if the decision be correct. They refused to appraise; because they adjudged that the relators had no right. If there was error in this, the remedy is not by mandamus. It is said the refusal to act, if it be so considered, is owing to a mistake of the law. The court will not, I trust, dispose of so important a question by granting a peremptory mandamus. They will rather award an alternative mandamus; in order that all the facts may be brought before them upon the return; and that the state may have its writ of error. At present, they are deprived of this privilege, the facts not appearing on the record.

But if there be no error, then, of course, they will not grant an alternative mandamus. The error should be shewn positively. On the case made out, the court will presume that the parties dare not swear that their land extended to the centre.

When the case of *Jackson* v. *Halstead* is compared with others, it will be found there is no material difference between them. The doctrine in *Hargrave*, that the owner of the bank owns to the centre of the stream, in all rivers where the tide does not ebb and flow, has been too long settled, and too often recognized, to be disputed by any one making the least pretensions to legal knowledge. I do

not deny that doctrine. I am insisting that there may be exceptions to that rule. I do this on the authority of *Jackson* v. *Halstead.* There is no need of a positive exception or reservation, if the grantee is limited to a particular boundary on the shore. This stops him short of the centre. It may or may not be, that these relators are bounded on the centre. If they are, let them be required to show the fact.

It is said the state cannot divert the water, without allowing damages, if the titles of the relators touch the river. I have admitted this; but the same answer applies. Let them show their right particularly. If they do not reach the stream, they have no right to the value of the water. If the boundary stops at the margin, they have no right to the water or the use of the water.

SUTHERLAND, J. intimated when the attorney general first moved, that there could be no objection to change the peremptory mandamus into an alternative one, if this alone was requested. The court, at the last term, understood the counsel for the appraisers as saying explicitly, that nothing farther was desired than the opinion of the court on the case, as it then stood; which would be acquiesced in by the appraisers. Otherwise, the course would have been to grant an alternative mandamus.

After the argument was closed; and the court had taken several days for advisement,

SAVAGE, Ch. J. remarked, that the main question made at the last term related to the extent of the boundary. The court were then of the opinion, that it carried the land to the centre of the stream. Nothing which had fallen from the attorney general on the re-argument, had changed their opinion upon this point. Objections, that a mandamus will not lie; and that the relators do not make out their case, are now started; but we adhere to the opinion, that the case is one to which the remedy by mandamus is applicable; and that the case is sufficiently made out in evidence. We understand the appraisers refused to act

ALBANY,
Oct. 26.

Ex parte
Jennings.

because they thought the bed of the *Chitteningo* belonged to the state; that they therefore had no jurisdiction, private property not being invaded. We hold otherwise; that private property has been invaded; that they have jurisdiction; and should go on and appraise. To what particular individuals the property may belong, is a question for them to decide.

It is, however, suggested, that the question is an important one, on account of the amount of the property involved in it; and that it should be put in such a shape as to be reviewed on error, should the state desire this. We think the suggestion perfectly right; and with a view to that object, we direct the former rule and subsequent proceedings to be vacated, and that an alternative mandamus issue. This will enable the appraisers to put the facts on record by a return, if they shall be so advised; and the judgment to be rendered on that return may be reviewed.

Rule accordingly. (*a*)

(*a*) The treatise of sir *Matthew Hale*, *De Jure Maris*, has been so often recognized in this country, and in *England*, that it has become the text book, from which, when properly understood, there seems to be no appeal either by sovereign or subject, upon any question relating to their respective rights, either in the sea, arms of the sea, or private streams of water. (*Vid. Palmer* v. *Mulligan*, 3 *Cain. Rep.* 307. *id.* 315, *per Thompson*, J. *id.* 318, *per Kent*, C. J. *People* v. *Platt*, 17 *John*. 195, 209, 210. *Hooker* v. *Cummings*, 20 *John*. 90, 99, *to* 101. *Adams* v. *Pease*, 2 *Con. Rep. N. S.* 481, 483, 484. *Arnold* v. *Mundy*. 1 *Halst. Rep* 1, 74. *Claremont* v. *Carlton*, 2 *N. H. Rep.* 369, 371. *Haye's Exr* v *Bowman*, 1 *Randolph's Rep.* 417. 420.) In *England*, even on rights of prerogative, the courts scan his words with as much care as if they had been found in *Magna Charta*; and the meaning once ascertained, they do not trouble themselves to search any farther. (*Vid. The King* v. *Lord Yarborough*, 3 *Barnw.* & *Creswell*, 91.) They almost justify, in respect to his writings, the extravagant encomium which Mr. *Wirt* has passed upon him as a judge; that, "with a mind beaming the effulgence of noon-day, he sat on the bench like a descended god!" (2 *Burr. Tr. by Rob.* 67.) His work is so often quoted, his doctrines are so full, his distinctions so clear, and his illustrations so striking and apposite, that they seem to deserve an insertion in our books, somewhat more at length than they are to be found in the quotations of counsel or judges; especially as there is, (I believe,) no late edition of the work; and, to many of the profession, it is not, therefore, readily accessible. It was first published by the learned *Fra. Hargrave*

among various other titles; and is usually cited as *Harg. Law Tracts.* The only title material to our purpose, " *De jure maris et b. achiorum ejusdem,*" is the first part of a manuscript treatise in three parts, by Lord Ch. Justice *Hale ;* and is therefore, sometimes cited as *Hale, De jure,* &c. This first part is divided into seven chapters of about 44 small octavo pages in the whole. The course I propose in this note, is to give the mere text of 4 chapters in this first part, *verbatim,* generally omitting the author's quotations ; which are mostly of MSS, or of old treatises, entries and reports ; all of which are, *quoad hoc,* superseded by the high authority of *Hale.* Instead of these, I will insert such late authorities, especially *American,* as have passed upon the very position laid down by him.

ALBANY,
Oct 1826.

Ex parte
Jennings.

## PARS PRIMA.

### *De Jure Maris et Brachiorum ejusdem.*

### CAP. I.

### *Concerning the interest of fresh rivers.*

Fresh rivers, of what kind soever, do, of common right, belong to the owners of the soil adjacent ; so that the owners of the one side have, of common right, the, propriety of the soil ; and consequently the right of fishing, *usque filum aquæ ;* and the owners of the other side, the right of soil or ownership, and fishing unto the *filum aquæ* on their side. And, if a man be owner of the land of both sides, in common presumption, he is owner of the whole river ; and hath the right of fishing according to the extent of his land in length. With this agrees the common experience. [*Palmer* v. *Mulligan,* &c. and other cases cited above at the beginning of this note.]

But special usage may alter that common presumption ; for one man may have the river, and others the soil adjacent ; or one man may have the river and soil thereof ; and another the free or several fishing in that river.

If a fresh river, between the lands of two lords or owners, do insensibly gain on one side, or the other side ; it is held that the propriety continues as before in the river. [What shall be deemed insensible gain. The *King* v. *Ld. Yarborovgh,* cited *ante, in this note* ] But if it be done sensibly and suddenly, then the ownership of the soil remains according to the former bounds. As if the river running between the lands of A and B, leaves his course ; and sensibly makes his channel entirely in the lands of A ; the whole river belongs to A. *Aqua cedit solo.* And so it is, though if the alteration be by insensble degrees, but there be other known boundaries, as stakes or extent of land. 22 *Ass. pl.* 93. And though the book make a question, whether it hold the same law in the case of the sea or the arms of it ; yet certainly the law will be all one, as we shall have occasion to shew in the ensuing discourse.

But yet special custom may alter the case in great rivers. For instance the river of *Severn,* which is a wild river ; yet, by the common custom used below *Gloucester bridge,* it is the common boundary of the manors of either side, what course soever the river takes ; viz. the *filum aquæ* is the common mark or boundary ; though it borrow great quantities of

land, sometimes of the one side, sometimes of the other ; and gives them to the opposite shore.

Though fresh rivers are, in point of propriety, as before, *prima facie*, of a private interest ; yet, as well fresh rivers as salt, or such as flow and reflow, may be under these two servitudes, or affected by them : viz. one of prerogative belonging to the king, and another of public interest, or belonging to the people in general.

Of these in the ensuing chapters.

### CAP. II.

#### *Of the right of prerogative in private or fresh rivers.*

The king. by an ancient right of prerogative. hath had a certain interest in many fresh rivers, even where the sea doth not flow or reflow, as well as in salt or arms of the sea ; and those are these which follow :

1st. A *right of franchise or privilege*, that no man may set up a common ferry for all passengers, without a prescription time out of mind, or a charter from the King. He [*the owner*] may make a ferry for his own use or the use of his family ; but not for the common use of all the King's subjects passing that way ; because it doth, in consequent, tend to a common charge ; and is become a thing of public interest and use, and every man for his passage pays a toll, which is a common charge. and every ferry ought to be under a public regulation ; viz. that it give attendance at due times, keep a boat in due order, and take but reasonable toll ; for if he [*the ferryman*] fail in these he is finable.    And hence it is, that if a common bridge be broken, whereby there is no passage, but by a boat or ferry ; it hath been anciently practised in the exchequer, to compel that ferryman, that ferries over people for profit, without a charter from the King or a lawful prescription, to account for the benefit above his reasonable pains and charge.

And this that is said in reference to a fresh or private river, holds place much more in a public river or arm of the sea ; and therefore it need not be repeated when we come to that subject.

2ndly.    An *interest*, as I may call it, of *pleasure* or recreation.    [Inapplicable to the U. States ; and obselete in *England*, as Hale says.]

3d. An *interest of jurisdiction ;* viz. in reference to common nuisances in or by rivers ; as where the sewers were not kept, which gave rise to the commission of sewers, as well for fresh rivers as for salt

And another part of the King's jurisdiction in reformation of nuisances is, to reform and punish nuisances in all rivers, whether fresh or salt, that are a common passage, not only for ships and greater vessels, but also for smaller, as barges or boats ; to reform the obstructions or annoyances that are therein to such common passage : for, as the common highways on the land are for the common land passage, so these kind of rivers, whether fresh or salt, that bear boats or barges, are highways by water ; and as the highways by land are called *altæ viæ regiæ*, so these public rivers for public passage are called *fluvii regales*, and *haut streames le Roy ;* not in reference to the propriety of the river, but to the public use ; all things of public safety and convenience being in a special manner under the King's

care, supervision and protection. And therefore the report in sir *John Davyes*, of the piscary of *Ban*, mistakes the reason of those books, that call these *streames le Roy.* as if they were so called in respect to propriety, as 19 *Ass.* 6. *Dy.* 11. For they are called so because they are of public use, and under the King's special care and protection, whether the soil be his or not

And this leads me to the third chapter.

## CAP. III.

### *Concerning public streams.*

There be some streams or rivers, that are private, not only in propriety or ownership ; but also in use. as little streams and rivers that are not a common passage for the King's people. Again ; there be other rivers, as well fresh as salt, that are of common or public use, for carriage of boats and lighters. And these whether they are fresh or salt, whether they flow and re-flow or not, are *prima facie publici juris*, common highways for man or goods, or both, from one inland town to another. Thus the rivers of *Wey* of *Severn*, of *Thames* and divers others, as well above the bridges and ports as below ; as well above the flowings of the sea as below, and as well where they have come to be of private propriety, as in what part they are of the King's propriety, are public rivers *juris publici.* And therefore all nuisances and impediments of passages of boats and vessels, though in the private soil of any person, may be punished by indictments, and removed ; and this was the reason of the statute of *Magna Charta, cap.* 23

*Omnes kidelli deponantur per Thamifam et Medwayam, et per totam Angliam nisi per costeram maris.*

These kinds of nuisances were such as hindered or obstructed the passage of boats, as wears, piles, choaking up of the passage with filth, diverting of the water by cutts or trenches, decay of the banks, or the like.

And they were reformed.

Sometimes by indictments or presentments in the leets, sessions of the peace, oyer and terminer, or before justices of assize.

Often times in the king's bench ; as *Hil.* 50 *E.* 3. *B. R. Rot.* 23. for nuisances in the river *Trent* ; *H.* 23. *E.* 3. *B. R. Rot.* 61. in the river *Ouse ; H.* 21. *E.* 1. in the river *Severn ; Tr.* 28 *E.* 3 *Rot* 29. in the river *Leigh ;* and generally in all other rivers within the bodies of counties. which had common passage of boats or barges, whether the water were fresh or salt ; the king's or a subject's.

Sometimes by special commission. as for the river of *Leigh.*

And sometimes by the parties that were prejudiced by such nuisance, without any process of law.

But if any person at his own charge, makes his own private stream to be passable for boats or barges either by making of locks or cutts, or drawing together other streams : and hereby that river, which was his own in point of propriety become now capable of carriage of vessels ; yet this seems not to make it *juris publici ;* and he may pull it down again, or apply it to his own private use. For it is not hereby made to be *juris publici.* unless it were done at a common charge, or by a public authority : or that by long

continuance of time it hath been freely devoted to a publick use. And so it seems also to be, if he that makes such a new river or passage doth it by way of recompence or compensation for some other public stream that he hath stopped for his own conveniency ; as in the case of the *Abbott* of *St. Austens, Canterbury* mentioned in the *Register*. So likewise, if he purchaseth the king's charter to take a reasonable toll for the passage of the king's subjects, and puts it in ure ; these seem to be devoting, and, as it were consecrating of it to the common use. As he that by an *ad quod amnum*, and licence thereupon obtained, changeth a way, and sets out another in his own land ; this new way is thereupon become *juris publici* as well as a way by prescription. For no man can take a settled or constant toll even in his own private land, for a common passage, without the king's licence.

## CAP. IV.

*Concerning the king's interest in salt waters, the sea and its arms, and the soil hereof; and first, of the right of fishing there.*

Thus much concerning fresh waters or inland rivers, which, though they empty themselves mediately into the sea, are not called arms of the sea, either in respect of the distance or smallness of them.

We come now to consider the sea and its arms : and first, concerning the sea itself.

The sea is that which lies within the body of a county or without. That arm or branch of the sea, which lies within the *fauces terræ*, where a man may reasonably discerne between shore and shore, is, or at least, may be within the body of a county ; and, therefore, within the jurisdiction of the sheriff or coroner.

The part of the sea which lies not within the body of a county, is called the main sea or ocean.

The narrow sea, adjoining to the coast of *England*, is part of the wast and demesnes and dominions of the King of *England*, whether it lie within the body of any county or not.

The king's right of propriety or ownership in the sea and soil thereof, is evidenced principally in these things that follow.

1st. The right of fishing in this sea, and the creeks and armes thereof, is originally lodged in the crown, as the right of depasturing is originally lodged in the owner of the wast whereof he is lord, or as the right of fishing belongs to him that is the owner of a private or inland river.

But though the king is the owner of this great wast, and as a consequent of his propriety, hath the primary right of fishing in the sea and the creekes and arms thereof ; yet the common people of *England* have regularly a liberty of fishing in the sea or creekes or armes thereof, as a public common of piscary ; and may not, without injury to their right, be restrained of it ; unless in such places, creeks or navigable rivers, where either the king or some particular subject, hath gained a propriety exclusive of that common liberty.

IId. The next evidence of the king's right and propriety in the sea, and the arms thereof, is his right of propriety to

The shore ; and

The *Maritima Incrementa.*

ALBANY,
Oct. 1826.

Ex parte
Jennings.

(1.) The shore is that ground that is between the ordinary high water and low water mark. This doth prima facie and of common right belong to the king, both in the shore of the sea, and the shore of the arms of the sea.

And herein there shall be these things examinable.

1st. What shall be said the shore, or *littus maris.*

2d. What shall be said an arm or creek of the sea.

3d. What evidence there is of the king's propriety thereof.

1. For the first of these ; it is certain, that that which the sea overflows, either at high spring tides, or at extraordinary tides, comes not, as to this purpose, under the denomination of *littus maris ;* and consequently, the king's title is not of that large extent; but only to land that is usually overflowed at ordinary tides. That, therefore, I call the shore, that is between the common high water and low water mark.

2. For the second ; that is called an arm of the sea where the sea flows and reflows ; and so far only as the sea flows and reflows ; so that the river of *Thames,* above *Kingston,* and the river of *Severn,* above *Tewkesbury,* &c. though there they are publick rivers, yet are not arms of the sea. But it seems that although the water be fresh at high water, yet the denomination of an arm of the sea continues, if it flow and reflow as in *Thames* above the bridge. [*Doug.* 444.]

3. For the third ; it is admitted that *de jure communi* between the high water and low water mark doth *prima facie* belong to the king, 5 *Rep.* 107. *Constable's case. Dy.* 326. Although it is true, that such shore may be. and commonly is parcel of the manor adjacent, and so may be belonging to a subject, as shall be shewn, yet *prima facie* it is the king's.

And as the shore of the sea doth *prima facie* belong to the king, viz. between the ordinary high water and low water mark, so the shore of an arm of the sea between the high water and low water mark. belongs *prima facie* to the king, though it may also belong to a subject, as shall be shewn in the next chapter. [He mentions here two cases, of a number of houses claimed by or in right of the king ; in which it was adjudged that the claim was good because they were built between high and low water mark, where the tide flowed and reflowed ; the one case arising upon the river *Tyne,* the other upon the *Thames.*]

And this shall suffice for the king's right in the shore of the sea, or rivers that are arms of the sea, viz. the land lying between the high water and the low water mark at ordinary tides.

(2.) The king hath a title to *maratima incrementa,* or increase of land by the sea ; and this is of three kinds, viz. 1. Increase *per projectionem vel alluvionem.* 2. Increase *per relictionem vel desertionem.* 3. *Per insulæ productionem.*

1. The increase *per alluvionem* is, when the sea, by casting up sand and earth, doth by degrees increase the land, and shut itself out further than the ancient bounds went ; and this is usual. The reason why this belongs to the crown is, because in truth the soil, where there is now dry land,

was formerly part of the very *fundus maris ;* and consequently belonged to the king. But indeed if such alluvion be so insensible, that it cannot be by any means found that the sea was there, *idem est non esse et non apparere;* the land thus increased belongs, as a perquisite, to the owner of the land adjacent.

2. The increase *per relictionem,* or recess of the sea. This doth, *de jure communi* belong to the king ; for, as the sea is parcell of the wast or demesne ; so, of necessity, the land that lies under it ; and therefore it belongs to the king when left by the sea ; and so also it regularly holds in lands deserted by a river, that is an arm of the sea or a creek of the sea, *prima facie,* especially if the creek or river be part of a port.

*Car. primi,* upon an information against *Oldsworth* and others, for that which is now called *Sutton Marsh,* that 300 acres of land was *relictum per mare,* and that the defendants had intruded into it ; the defendants pleaded specially, and entitled themselves by prescription to the lands project by the sea ; and upon a demurrer adjudged against them. That 1st. by the prescription or title made to lands project, which is *jus alluvionis,* no answer is given to the title of information for lands relict, for these were of several natures. 2. It was held, that it lies not in prescription to claim lands relict *per mare ;* for so if the channel between us and *France* should dry up, a man might prescribe for it, which is unreasonable ; for

*Nihil prescribitur nisi quod possidetur.*

But this hath found some exceptions, besides these that follow in the ensuing chapter.

If a subject hath had by prescription, the property of a certain tract, or creek, or navigable river, or arm of the sea, even while it is covered with water, by certain known metes or extent ; this, though it should be relicted, the subject will have the propriety in the soil relicted. For he had it before, though covered with water ; and although the sea is a fluid, yet the *terra* or *solum subjectum* is fixed ; and by force of a clear and evident usage, a subject may have the propriety of a private river ; though the acquest of the former be more difficult, and requires a very good evidence to make it out, as shall be said in the ensuing chapter.

If a subject hath land adjoining the sea, and the violence of the sea swallow it up, but so that yet there be reasonable marks to continue the notice of it ; or though the marks be defaced : yet if by situation and extent of quantity, and bounding upon the firm land, the same can be known, though the sea leave this land again, or it be by art or industry regained, the subject doth not lose his propriety ; and accordingly it was held by *Cooke* and *Foster,* M. 7. Jac. C. B. though the inundation continue forty years.

If the mark remain or continue, or extent can reasonably be certain, the case is clear.

3. The third sort of maratime increase are islands arising *de novo* in the king's seas, or the king's arms thereof. These upon the same account and reason *prima facie* and of common right belong to the king ; for they are part of that soil of the sea, that belonged before in point of propriety to the king ; for when islands *de novo* arise, it is either by the recess or sinking of the water, or else by the exaggeration of sand and slubb, which in process

of time, grow firm land environed with water ; and thus some places have arisen and their original recorded, as about *Ravensend* in *Yorkshire*.

And thus much of the king's right of propriety which he hath in the sea ; and also *prima facie* and in common presumption, in the ports and creeks and armes of the sea.

**ALBANY,**
Oct. 1826.

Ex parte
Jennings.

---

Mr. *Butler* in his note [205] to *Co. Lit.* 261, *a*, considers Ld. *Hale* as having exhausted the subject upon which he treats ; and had this great man followed out his doctrine of private rivers, with its various consequences and illustrations, as fully as he has done his doctrines of the sea and its arms, very little would have been left for our courts to do in filling up the outline. As his positions are, however, more general in respect to the former, while at the same time, they are of more extensive application, they have been oftner the subject of discussion in our courts ; and would seem to call for farther notice.

The general policy and excellence of his doctrines have been the most fully and ably vindicated in *Connecticut* and *New-York*. " A more perfect system of regulations on this subject," (says Ch. J. *Swift,* 2 *Con. Rep. N. S.* 483,) " could not be devised. It secures common rights, as far as the public interest requires ; and furnishes a proper line of demarcation between them and private rights " This doctrine, says *Hosmer*, J. " promotes the grand ends of civil society by pursuing that wise and orderly maxim of assigning to every thing capable of ownership, a legal and determinate owner." These remarks are followed up and vindicated by *Spencer*, late c h. Justice, in *Hooker* v. *Cummings*, (20 *John.* 101.)

The general distinctions, deemed of so much excellence and importance by these learned judges ; and which, at this day no lawyer will hazard his reputation by controverting, are, *that rivers not navigable, that is, fresh rivers, of what kind soever, do, of* COMMON RIGHT, *belong to the owners of the soil adjacent, to the extent of their land in length.        and that rivers where the tide ebbs and flows belong of* COMMON RIGHT, *to the state. That this ownership of the citizen is of the whole river, viz. the soil and the water of the river ; except, that in his river where boats, rafts, &c. may be floated to market, the public have a right of way or* EASEMENT. In a special manner where the subject claims under *a grant from the state*, bounded by a river not navigable, this grant extends *usque filum aquœ ;* as was held in *Hayes's exr.* v. *Bowman.* (1 *Randolph's Rep.* 420, *per Cur.,*) *Claremont* v. *Carlton,* (2 *N. H Rep.* 369, *S. P.*) and *Lunt* v. *Holland,* (14 *Mass. Rep.* 149.) This was also admitted by the attorney general, it will be recollected, in arguing the principal case, (ante, 534 )

The only question that can generally arise between the citizen and the state, as to the ownership of rivers above the tide, is, whether the former be *owner of the soil adjacent*, within the meaning of *Hale*.

As to this question ; there is certainly no technical or particular mode of expression in the grant, necessary to make him so. In the case of the river *Banne*, (*Dav.* 152) it is said, in every river not navigable, " the *tertenants* on each side have an interest of common right ;" and so is the abbreviation of that case in 2 *Rol. Abr.* 170, *pl.* 14, which was edited by *Hale*. By *Holt*, 12 *Mod.* 510, " If a river run contiguously between the *land of two persons*, each of them is, of common right, *owner* of that part of the river which is

*next* his land." By Lord *Mansfield*, in *Carter* v. *Murcot*, (4 *Burr.* 2164,) " In rivers not navigable, *the proprietors of the land* have the right of fishery on their respective sides : and it generally extends *ad filum medium aquæ."*

The proposition for the cititizen to establish, then, is that he is the *owner, tertenant,* or *proprietor* of the *soil adjacent* to the river above the tide ; and then, *of common right,* he owns the river.

1. *Owner tertenant* or *proprietor.*] No doubt this may be either in fee or of any particular estate, of an equitable or legal estate ; and the ownership of the river shall be co-extensive in estate, as well as territory. This was held in the principal case, (ante, 518.)

2. *Of the adjacent soil.*] Adjacent, (in Lat. *adjacens ab adjaceo,*) is defined lying close, bordering upon. The *Lat.* verb means, to lie contiguous, or border upon, to abut, adjoin. Thus an assize stated by *Hale De Jur. Mar. ch.* 1, is "quia dicunt, quod omnes, qui tenent terras ABUTTANTES super aquam illam, in ea piscantur pro voluntate sua usque filum aquæ." &c. This was of the *Idell,* a fresh water stream ; and upon this there is no difference in the cases. All agree that where a man's land *abuts* upon or *adjoins* to any river above tide water, he owns the river to the centre of the stream. As long ago as 1805, in *Palmer* v. *Mulligan,* it appearing that the defendant owned the shore of the *Hudson* as low down as *Stillwater,* this being above tide water, *Thompson,* J. and *Kent,* C. J. applied to his case the doctrine of Ld. *Hale,* that his ownership extended to the centre of that great river ; and the latter then hinted at what is now established, that if the state will bound a grantee upon a river not navigable, he shall hold to the centre, *unless there be an exception of the river in the grant.* (*Vid.* 3 *Caines,* 319.) In *Adams* v. *Pease,* (2 *Con. Rep. N. S.* 481.) the plaintiff owned a large farm bounded east *on Connecticut river,* above the flowing of the tide ; but where it was large, and passable with flat bottomed boats of from 5 to 30 tons burthen ; and sometimes vessels built above had been floated down ; yet held that the boundary, in terms, *on the river,* carried the pla ntiff's ownership of the river to its centre. The rule is there laid down by *Swift,* Ch. J. that the *adjoining proprietors* have this right. The doctrine of this case was approved in its full extent, by the supreme court of this state, in *Hooper* v. *Cummings,* (20 *John.* 91) where it was applied to *Salmon* river which empties into lake *Ontario. Spencer,* Ch. J. who delivered the opinion of the court, says, " If the soil *on both sides* be owned by an individual, he has the sole and exclusive right ; but if there be different *proprietors on each side,* they own their respective sides, *ad filum medium aquæ."* And the court approved what *Kent,* C. J. said in *Palmer* v. *Mulligan,* touching the *Hudson* being private property as low down as *Stillwater.* They also show that the cases which hold the contrary in *Pennsylvania* are founded on a repudiation of the common law. (Vid. also 17 *John.* 209, 10, &c.) In *Arnold* v. *Mundy,* (1 *Halst. N. J. Rep.* 1) the plaintiff's land *ran to,* or was bounded *on a river* where the tide did ebb and flow ; and he and those under whom he claimed, had staked off and planted a bed of oysters, some of which the defendant took away ; for which the action was brought. At the trial, the defendant's counsel moved for a nonsuit; and the judge in giving his opinion remarked, (*id. p.* 10) " that a grant of land to a subject or citizen, *bounded upon a fresh water stream or*

*river*, where the tide neither ebbs nor flows, extends to the middle of the channel of such river; but that a grant bounded upon a navigable river, or other water, where the tide does ebb or flow, extends to the edge of the water only, (that is to say, to high water mark, when the tide is high, and to low water mark when the tide is low; but it extends no farther;" and he nonsuited the plaintiff upon this distinction. On a motion to set aside the nonsuit, the supreme court, after a very learned argument, confirmed the distinction; and refused to set aside the nonsuit. The Reporter, in his marginal note, has set down this as one resolution of the court: " A grant of land bounded *upon a fresh water stream or river*, where the tide neither ebbs nor flows, extends *ad filum aquæ ;* but a grant bounded upon a navigable river extends to the edge of the water only." In *Claremont* v. *Carlton*, (2 *N. H. Rep.* 369,) lot no. 46 was admitted, at the trial, to be bounded south *on Sugar river*, above tide water ; and an island lying on the *north side* of the river was held to pass by the grant, which was by the government of *New-Hampshire.* The river and island were held to pass upon the principles adopted by lord *Hale*, whose doctrine is recited at length and approved by the court. In *Hayes's exr.* v. *Bowman*, (1 *Randolph's Rep.* 417,) the words of the grant were, "lying on the west side of south *river*, and bounded *by the same.*" This was where the tide did not flow. The court say, " where the commonwealth, having title to lands lying on both sides of a watercourse not navigable, grants the lands lying on one side thereof, and *bounded thereby*, it is universally admitted that such grant carries with it the title to a moiety of the watercourse. There can be no reason assigned why this rule, *so just in relation to grants by the commonwealth*, should not equally apply to conveyances by individuals." And they held that a moiety of the bed of the stream passed. In the case of *King* v. *King*, (6 *Mass. Rep.* 496,) it appeared that *Benjamin King* was seized of two tracts of land, opposite to each other, on the east and west sides of *Sheepscut* river, and *adjoining thereto*, conveyed to him *by boundary lines which included a part of the river* where it passed over falls and formed a site for mills. And it was held that even this *specific boundary* could have no effect in excluding the remainder of the river. The court say, " *Benjamin King* was entitled to two tracts of land, situate on the east and west sides of *Sheepscut* river, *described* and conveyed to him by *boundary lines* which include a part of the river ; *and of course, by the legal operation of his title*, the *falls* and *bed* of the river, with *all permanent water priveleges*, wherever the river flowed between the tracts of land conveyed, or covering any part thereof." (*id.* 498.) *King* having died so seised, his heirs made partition by deeds, the import of which was an assignment of two parcels on the *western side* to his son *Moses ;* and of that on the *eastern side* to his son *Peter.* The court say, " the *legal operation* of this partition and assignment is, that the *falls* and *bed* of the river, and the water privileges were alike divided and assigned, as *parcel* of the two tracts ; which, after the partition, were to be considered as separated, so far as they lie opposite to each other upon the river, *by a central line*, or the *thread of the river*, as it is sometimes expressed." This was evidently decided as will be seen by the conclusion of the

sentence, on the authority of *Hale's* doctrine, though he is not formally cited. In *Jackson* v. *Louw*, (12 *John.* 252,) the line ran south *to the Platte-kill*, above tide water : thence *up the same.* to the southwest corner of a lot this day conveyed to the said *Abraham Louw jun'r.* The court say, (p. 255,) " the terms ' up the same,' necessarily imply that it is to follow the creek, according to its windings and turnings ; and *that must be in the middle or centre of it. The rule is well settled,* that when a creek, *not navigable,* and which is *beyond the ebb and flow of the tide,* forms a boundary, the line must be so run " In *Lunt* v. *Holland,* (14 *Mass. Rep.* 149,) the plaintiff derived title from a *grant of the commonwealth,* thus : " A certain tract of land lying in the township numbered one, in the county of *Cumbe land,* which was surveyed and laid out in *April.* 1789, by *Samuel Titcomb.* and is bounded as follows, to wit, beginning at a *hemlock tree* standing *by the south side* of the river *Androscoggin,* thence south, &c. to *another hemlock tree* also standing *by said river,* thence south-eastwardly, and bounding by said river to the first mentioned bound," &c. The plaintiff claimed an island of 30 acres, the river running each side of it, lying between the two hemlock trees, and *nearest* the shore of the plaintiff's grant. One question was, whether, as *Titcomb's* survey included the island, it did not pass to the plaintiff for that reason, the survey being referred to by the grant : and the court held that it did. But another question directly raised and passed upon was, whether the boundary by the two hemlock trees, one mentioned as standing on the *south side of the river,* and the other as standing *by the river,* would not in construction of law, extend into the centre of the stream on the side of the island farthest from the line running between the two trees. *Fessenden,* for the defendant, upon this point, contended, that the island was excluded by visible and known monuments. " Bounding by the river," must intend that *edge* of the river on which the hemlock trees stood ; or those trees could not be any part of the boundary. The judge, at the trial, charged that " land granted as bounded *by a river,* is held to extend to the thread or channel of the river ; and as here were two channels, it might well be presumed the intent of the parties to the conveyance, that the grant was intended to extend to that channel which would include the island." The court, in delivering their opinion at bar, say, " land granted as bounded *by a river,* extends to the thread of the river, *unless from prior grants on the other side of the river, such a construction is negatived ;* and in this case, the channel on the farther side of the island may well be considered as intended by the description in this grant." This case was very strong for the state. The line along the river was limited nominally to two trees on the same side of the stream. One of these trees might not have touched the river at all. Yet upon the principles of *Hale,* these marks are departed from, the river itself adopted as the boundary ; and the line extended over, and made to include an island lying on the side of the river nearest to it. We have before seen that this very point was adjudged in *Claremont* v. *Carlton,* (2 *N. H. Rep.* 369,) upon a boundary which was in terms *on the river.* But there were no definite monuments to restrain and bind it down to *the margin of the stream. Lunt* v. *Holland,* decides that a line running between two trees, one stand-

ing *by the side of*, and the other *by the river*, is a *bound.ng* or *abutting* on the river ; that the grantee is, therefore, an *adjacent owner*, and his land extends, of common right, *usque filum aquæ*. In *Harramond* v. *McGlaughn*, (*Tayl. Rep.* 196,) it appears that a somewhat similar question arose in the superior court of law of *North Carolina*, in 1798. About 50 years before, the state had granted to the defendant, by patent, a tract of land beginning at a hickory, standing *not far* from a river ; and running thence *down the river* a certain *course* and *distance* ; but the *course* ran *odliquely* from the river, leaving between it and the river a triangular piece of land. The state claimed this triangle, and in 1787, granted it by patent to the plaintiff, who brought ejectment. The court held that the river was the boundary of the first grant ; and decided against the claim of the state. They say, " when a deed, patent or grant, describes a boundary from a certain point *down a river, creek, or the like*, mentioning also course and distance ; should the latter be found not to agree with the course of the river, creek, &c. it ought to be disregarded, and the river considered the true boundary." The expressions used to designate the boundaries and extent of grants upon the *Missisippi* are, *tant d'arpents de face*, or *tant a'arpents face au fleuve*, or *tant d'arpents face sur le fleuve ;* and these expressions, when thus unqualified, have, without a single exception, been considered as giving the grantee a boundary *on* the river. (5 *Hall's Law Journal*, 120 ) Did the common, instead of the civil law apply to the *Missisippi*, no doubt such grants would give title to its bed *usque fi um aquæ*. As to a boundary *on the margin* of a creek or river, as stated of that in the principle case, (ante, 518) it seems to be the very dividing line between the water and the land, the line touching both. It is synonymous with *shore*, which *Parsons*, Ch. J. says, in *Storer* v. *Freeman*, (6 *Mass. Rep.* 439.) when applied to the sea, " must be understood to mean the margin of the sea in its usual and ordinary state. Thus, when the tide is out, low water mark is the margin of the sea ; and when the sea is full, the margin is high water mark " In analogy, to the margin of the sea, it would seem that the margin of a fresh water river or creek must be the ordinary water mark. " The shores of a river border on the water's edge." (5 *Wheat.* 385.) And then it would be more than splitting hairs ; it would be splitting mathematical lines, to separate the boundary from the river. According to this definition, the relators were literally and mathematically *adjacent* owners within *H e's* doctrine. In *Storer* v. *Freeman*, (*id.* 438,) one boundary was to *the shore* of the neck ; thence *by the shore* of the neck ; another was to a *heap of stones at the shore* of the neck, at *W. E's corner* so called, thence *by the shore*, &c. This was where the tide ebbs and flows ; and *Parsons*, Ch. J seems to take it for granted, that such boundaries, if upon a stream above tide water, would have carried the ownership, *usque filum aquæ*, as being a boundary on the water. He accordingly goes on to draw a distinction between the two cases. He says, " by the common law of *England*, which our ancestors brought with them, claiming it as their birth-right, the owner of land bounded on a fresh water river, owned the land to the centre of the chan-

nel of the river, as of common right ; but, if his land was bounded on the sea, or an arm of the sea, where the tide ebbed and flowed, he could not, by such boundary, hold any land below the ordinary low water mark, for all the land below belonged, of common right, to the king."

Thus explore the books of the common law, wherever that law prevails : And in no case as between sovereign and subject, except the principal one, has it ever been questioned, that where a grant, either actually or constructively, goes to the water's edge, the grantee is the owner to the centre of the river, if it be above tide water. Lastly, he is the owner

*Of common right.*] It will be remembered that this phrase continually occurs in *Hale*, and in the decisions which follow him. It is an important, an emphatic part of the proposition with which we set out ; and has been defined, in its general sense, by the greatest writer in the law ; and by one very little his inferior, as to the particular sense inwhich it is used by *Hale*. First, I quote from Lord *Coke*, who explains its use by *Littleton*. (*Co. Lit.* 142. *a.*) " ' De common droit,' of common right ; that is, by the common law ; so called, because the common law is the best and most common birth-right that the subject hath, for the safe guard and defence, not onely of his goods, lands and revenues, but of his wife and children, his body, fame and life also. So as the meaning of *Littleton* in this particular case is, that the lord may distreine for his rent of common right, that is, by the common law, without any particular reservation or provision of the party. And it is to be observed that the common law of *England* sometimes is called *right,* sometimes *common right,* and sometimes *communis justitia. Littleton,* in this his treatise, nameth *common droit* sixe times." Thus, within the sense given by Lord *Coke,* the party whose grant bounds him by any words on a river, or its margin above tide water, owns of course, without any express *provision* in the grant *usque filum aquæ.* The right is incident and annexed by law to his grant, the same as a right of distress to a rent service of which Lord *Coke* is speaking. In the notes to *Co. Lit.* by *Hargrave* & *Butler,* the latter, (*note* 205 to *p.* 201. *a.*) speaking of *Hale De Jur Mar.* says, " That where, in enquiries of this kind, it is said that a person is entitled to the right, or property in question, *by common right,* but that it *may* belong to another, it is intended to say, that the right or property in question is, by the *common law* annexed to the particular capacity of the party, or to some property of which he is the owner ; yet that it is not so inseparably or inalienably annexed to this capacity or ownership, but that the party *may* transfer it to another."

Thus where one owns the shore of a river above tide, by grant from the state ; the common law (*common right*) annexes to his capacity as owner, the right of soil in the river *usque filum aquæ.* And it has often been said by our courts, that the only way in which this right of soil in the river can be withheld from the subject, is by a reservation express or implied. This doctrine as I before remarked (ante, 544.) was hinted by the sagacious *Kent,* the chief justice of the supreme court, in *Palmer* v. *Mulligan,* (3 *Caines,* 319.) And it was afterwards directly advanced by the court in *Claremont* v. *Carlton,* (2 *N. H. Rep.* 371, 372.) It is there said this exception may be by the acts of the parties, or an express provision in their conveyances. So in *Hayes's exr.* v. *Bowman,* (1 *Randolph,* 420, *cited an-*

*te,* 545,) the court say, " If it be the wish of the grantor not to convey the bed of the stream, or of any part thereof, it is easy for him to exclude it, by the use of words proper for that purpose. In the absence of such words, the moiety of the bed of the stream passes by such conveyance." So in the principal case, (ante, 528,) the supreme court lay down the same doctrine. And all the various expressions running through the books and cases, such as *of common right, by operation of law,* or *by construction of law,* mean the same thing ; that the law carries the owner of the bank to the centre, unless otherwise expressed ; and then *expressum facit cessare tacitum.* An exception may sometimes be implied, as where the river, or an island in the river, was previously granted. (14 *Mass. Rep.* 151.) Thus in *Hatch* v. *Dwight,* (17 *Mass. Rep.* 289,) E., in 1807, mortgaged a strip of land including mills, and running a considerable distance along a river ; but in 1810, having sold a small piece of the mortgaged premises, for a hide mill and lime vats, he obtained a grant, or rather release from the mortgagee, for a nominal consideration, of what he (E ) had sold ; described thus : beginning at the *end of a dam ;* running up the river two rods, and so round, *to the bank of the river.* The mortgagee afterwards having foreclosed, one question was, whether the grant or release gave a right to the centre of the river ; and it appeared that if it was to have this effect, it would destroy the value of the mortgagee's mill privileges. For this, and other reasons, it was held that it should not extend beyond the bank. The various reasons assigned by the court were, that the grant or release was limited to the bank ; that there were no general words shewing that a right to keep up a dam, was intended to pass ; that the consideration was nominal ; and it was not to be inferred that the mortgagee intended to release every thing valuable in the mortgaged premises, for which she had given a large consideration. The court considered the release, under all the circumstances, as being no more than a mere exception in the mortgage. There were various and special circumstances in the case, which led the court to infer that the parties intended to limit the release or grant to the bank. And in conclusion they say, " Without doubt, by our law, the *owner* of land extending *to the bank of a river,* will own to the middle of the river, if it be not navigable, and so public property. But the owner *may* sell the land without the privilege of the stream. as he will, if *he bounds his grant by the bank.*" They continue, " the description in the release very clearly *excludes* any part of the stream ; and as before observed, there are no general words of a more extensive signification." This case was between individuals, and must undoubtedly be referred to its peculiar circumstances. The court admit that an owner *to the bank of a river,* owns the river ; but immediately say that he may bound his grant *by the bank,* and the stream will not pass. This must evidently mean a bounding by reservation, or plain exclusion express or implied. Otherwise the expression would be inconsistent in itself, and incompatible with all principle and all the cases. It is plain that the naked circumstance of bounding a grant *on, to* or *by* a bank, cannot exclude the stream, any more than bounding on the margin of the stream itself ; and this the court admit ; for certainly, owning " to a bank," is no more than owning *on* or *by* a bank. It is farther evident that this case

ALBANY,
Oct. 1826.
〰〰〰
Ex parte
Jennings.

does not rest on the particular words of the release, from the circumstance, that the reporter has not mentioned in his marginal note or index, any point as being settled or countenanced by this branch of the case. He doubtless looked upon it as a case entirely *sui generis*, in this respect ; and as depending on numerous circumstances, which might never again conspire. Indeed, it is not readily perceivable how the case can, in this branch of it, ever be a guide for any other. Another singular circumstance is, that the court should rely on *Storer* v. *Freeman*, (6 *Mass. Rep.* 435,) for the only general doctrine which they appear to lay down. The question presented by that ease was, as to the extent of a grant bounded upon the *sea shore*. In the case of a river not navigable, every possible intendment is in favor of the grant going to the centre ; whereas, in case of the sea, the intendment is directly otherwise. *Jackson* v. *Halstead*, (5 *Cowen*, 216,) was also a question between individuals It was conceded that the *Delaware* was private property ; but, as remarked by the learned counsel for the relators in the principal case, (ante, 531,) the question was not raised as to the constructive extent of the grant. Probably it could not arise. *Palmer*, the common source of title. owned the whole river ; and in his grant, so far as it related to the river, had used words which would convey a *mere right of fishery ;* and nothing more. It would have been subverting the express intention of the parties, to have allowed the usual constructive operation to the grant. It was the same thing in respect to the river as if the grantor had retained both shores, and granted in terms a mere fishery within the water. Had the grantor stopped at the words which bounded the grantee upon the river, beyond all doubt the soil would have passed *usque filum aquæ* ; (12 *John.* 252 ; 1 *Randolph*, 417 ; 2 *Con. Rep. N. S.* 481 ; *Tayl.* 196 ;) and so would the island, had it lain on the grantee's side of the stream. (2 *N. H. Rep.* 369. 14 *Mass. Rep.* 140.) It was not thought worth while, even to inquire which side of the river the island lay. The decision turned wholly on the legal effect of granting a *river* by its name

I am sensible that I owe the profession an apology for the length of this discussion, and its verbal and minute criticisms. But the amount involved is neither verbal nor minute. It was stated by the counsel of the appraisers, (ante, 523,) to be $100,000, on the line of the canals alone. Take the whole state with its immense inland waters ; and it gives an aggregate of millions. Probably there is hardly a patent in the state which grants the bed of a stream by name. I am informed that our patents have generally selected these streams as the best and most convenient limits for their grants, and are abutted or bounded upon them by different words ; leaving it to the common law to say what portion of the stream passes, accordingly as the boundary may be above or below tide water. Our considerable rivers and creeks are covered with hydraulic machinery, and other establishments, depending for their value and their existence on the doctrine that these patents carry the ownership of the grantees to the thread of the stream. What more usual description of parcels than a line running to a given point on a creek or river ; and then along the same as it winds and turns, for many miles? It is speaking within bounds, to say

that, adopting the construction contended for by the appraisers, would subvert individual claims to millions of property, the private ownership in which, has never before been doubted. The prerogatives of the state, set up by the appraisers, are not limited by a criticism upon the word *margin,* as in the case of the *Chitteningo.* They claim as public property, every stream above tide water where a raft or a small boat can be navigated, unless that stream has been granted *in terms* by the state. They claim not merely a right of passage or highway for the people : that is conceded by the common law ; but a *right of soil in the state.* Several instances of this kind have occurred.

### *Ex parte* GEO. TIBBITS, *Oct.* term, 1826.

In this case it appeared that a valuable waterfall of 12 feet, in the middle sprout of the *Mohawk,* which falls into the *Hudson* between *Van Schaick* and *Greene* islands, had been destroyed by a dam erected for the use of the canals. That the tide never ebbs and flows at the fall. This fall was granted, in terms, as so much land covered with water, *May* 5, 1792, by *Stephen Van Rensselaer* to *Jacobus Van Schoonhoven ;* and had come by mesne conveyances to the relator ; there being an actual individual seisin of the fall *eo nomine* for upwards of 30 years. It is well known that the land on both sides of the fall was granted away at a very early period by the state, which had not afterwards asserted the least claim.

The appraisers refused to allow the relator any damages, on the *sole ground* that the land under water belonged to the state.

The supreme court granted an alternative mandamus, in this case, against the appraisers, at the time they decided *Jenning's* case.

*J. P. Cushman* for the relator.

The following case came under the review of the supreme court, on appeal from an appraisal by the canal commissioners. It related to a valuable landing or *depot* for lumber on the river *Hudson,* which was inundated and destroyed by the colossal dam at *Fort Edward :*

### *Ex parte* WALTER and CHARLES ROGERS. *Utica, August* term, 1825.

The affidavit of one of the owners stated, that 21 acres at *Deadman's point,* above the dam, and lying *adjacent* to the *Hudson* river, had for many years before the erection of the dam, been used as a landing ground for lumber, yielding an average income to the two proprietors, (to whom it had been devised by their ancestor,) of *about* 400 *dollars annually.* That it had been rendered nearly useless as a landing, from the time when the canal commissioners commenced the dam at *Fort Edward,* for a feeder to the northern canal, in the summer of 1821 ; and when the dam was completed in the summer of 1822, the landing was inundated, and the buildings removed. That the canal commissioners, Messrs. *Young* and *Seymour,* had appraised the damages in *March,* 1825, at *only* 630 *dollars.* And they informed the deponent, " that they estimated the land inundated, *for the purpose of tillage,* without reference to its value *as a landing ground,* at 30 dollars per acre." That the value of the land consisted almost en

ALBANY,
Oct. 1826.

Ex parte
Jennings.

tirely of its advantages as a lumber, yard, which were destroyed by the dam. It appeared that a copy of this affidavit and notice of the appeal had been served on Mr. *Young*, who did not controvert the truth of the affidavit.

On motion to set aside this appraisal, the *single point stated, (and it was stated and discussed in writing*,) was, that the commissioners should have allowed the value of the premises destroyed *as a landing.* It was argued that this was its value to the owners; this would have fixed the price in market, which would obviously have been about $6000, instead of $630. The latter was but little more than the income for a single year. The motion was not opposed by the commissioners; but the court, as was their course on all appeals from these appraisals, took the papers, examined the question, and set aside the appraisal; deciding that it should have been according to the value *as a landing ground.*

I was afterwards informed by Mr. *Young*, that he had acted in awarding such small damages, on the principle that the soil of the *Hudson* at the place in question, though far above tide water, belonged to the state.

With deference, this was evidently adopting a new rule, unknown to the common law. It was not only adopting a new rule; but it was carrying that rule, in its application, one step farther than it ever can be carried, Admitting the more despotic rule of the civil law : " *Flumina autem omnia, et portus, publica sunt : ideoque jus piscandi omnibus commune est in portu fluminibusque ;*" (*Just. Lib.* 2, *tit.* 1, *s* 2 ;) the conclusion drawn by the canal commissioners, would, by no means, follow. The common law, *so applied*, would authorise them, in the prosecution of their splendid works, to cut up or inundate the valuable lumber yards at *Troy*, *Albany* or *New-York*, and then to pay, instead of their value *as lying on a public stream*, the price which they would fetch in market, as wheat fields, meadows, &c. according to their *agricultural* value. Their value arises from their local situation and advantages, their worth in market ; and the revenues derivable from them are to be taken into the account. (*The Schuylkill Navigation Co. v. Thoburn*, 7 *Serg. & Rawle*, 411. 1 *Domat*, 431, *Of the restitution of fruits*, 1, 2, 3.) The state is bound to make restitution upon the same principle as an individual, who should commit the injury. (1 *Bl. Com.* 141, 2.) This is so even in more despotic countries ; (2 *Montesq. L'Esp. de Lois, ch.* 15 ;) and the maxim, *sic utere tuo ut alienum non lædas*, applies with equal force to both. I do not, therefore, think that the decision of the supreme court, necessarily involved the question, whether the *civil* or *common law* should prevail. I do not believe they stopped to inquire whether the *Hudson* was a public or private river at the place in question. Such a point was not presented by the affidavit. This did not state whether the place was above or below tide water ; nor was the point raised in argument. It is evident, therefore, that the court held the result to be the same, upon both the *civil* and *common law.*

On the case coming before the present appraisers, the question whether the *Hudson*, at the landing, was private property, was again raised, as will be seen by the case which they drew up, with a copy of which I have been favored. It is in these words :

### In the matter of CHARLES & WALTER ROGERS.

" They claim title to a tract of land lying within the bounds of the *Kay-aderosseras* patent, which was granted on the 2d *Novr.* 1708 ; bounded as follows : ' thence easterly or northerly to the third falls on *Albany* river,' [*Baker's Falls* on the *Hudson*. 1 *John.* 156.] ' about 20 miles, more or less ; *thence along the said river, down southerly,* to the northeasterly bounds of *Saratoga,*' &c.

About 21 acres of that tract lie on the west margin of the *Hudson* river, and about 1-2 a mile above the dam at *Fort Edward*. A part of the tract, before the dam was built, was used as a place on which to deposit lumber, for the purpose of rafting and floating it down the river ; and which produced an annual revenue to the claimants, as they allege, of $400 or $500 ; but which, since that dam was built, is rendered totally useless for that purpose ; the dam having destroyed the navigation of the river to that place, and covered the land with water about 27 feet deep.

The place in question *is about* 40 *miles above tide water ;* and much farther above where the water becomes fresh. There is no natural and continued navigation up the river to the land which is the subject of this claim.

On the 15th *April*, 1771, 62 years after the grant of the *Kayaderosseras* patent, the British government made a grant to *Henry Stilson*, the subject of which is described as follows : ' All that certain tract of land, ground and soil, under and covered with the water of *Hudson's* river, in the county of *Albany*, within our province of *New-York ;* beginning on the west bank of the said river, at the division line between lot No. 7 and lot No. 8, in the 19th allotment of the *Kayaderosseras* patent ; and runs thence into the river, east 3 chains, then parallel to the said bank of the said river, at 3 chains distance, south 13 degrees east, 1 chain and 60 links, and south 30 degrees east, 5 chains and 60 links, then west 3 chains and 65 links to the bank of the river ; and then along the said bank, as the same doth wind and turn, northward to the place of beginning, containing 2 acres ; together with all and singular, the benefits, liberties, privileges, waters, watercourses, mills, mill dams, easements, emoluments, tenements and hereditaments whatsoever,' &c. [*Book of Military Patents, No.* 2, *p.* 379, 590.]

The questions are, 1. Are the claimants entitled to the value of this land, according to its *increased value by means of the use and unobstructed navigation of the river*, as it was before the dam was built ; or are they only entitled to its *value for agricultural purposes ?*

2. Are the claimants entitled to pay for their *fishery*, which has been destroyed by the dam ?"

Now, there is no doubt, upon the cases before cited, that the boundary " to the falls, and thence along the river down southerly," &c. to which the 21 acres in question extend, will, *per se*, carry the right of soil in the claimants to the thread of the *Hudson*. (12 *John.* 252, 255. 14 *Mass. Rep.* 149. 2 *Con. Rep. N. S.* 481. 2 *N. H. Rep.* 368.) Of course, the exclusive right of fishing goes to the same extent. (20 *John.* 90.)

The only argument against this construction is the little 2 acre military patent to *Stilson*. Now, had this been granted *before* the *Kayaderosseras* patent issued, and had it been a part of the identical bed of the river covered by the 21 acres, it must be admitted that, within what the court say

in *Lunt* v. *Holland,* (14 *Mass. Rep.* 151.) it would have operated as an exception from the *Kayaderosser s* patent, *pro tanto* But clearly not, being as it is, *subsequent* to the issuing of the *Kay derosser s* patent. The very point was adjudged in *Harramond* v. *McG aughon,* (*Tayl. Rep.* 196.) This little river patent lies 8 or 10 miles below the 21 acres. It was a void grant. The *very two acres* had before passed by the great patent of *Kayaderosseras ;* and so far from being an argument of cotemporaneous construction, this little thing could not have sustained itself *upon its own ground,* had it been attacked in season by the patentees of the *Kayaderosseras.*

It will be seen, by the above sketches, that the board of canal appraisal, and the regular and ordinary tribunals of the country, have, in their respective adjudications upon the right annexed to riparian ownership, begun at different points. The former, in effect, have begun at the *civil law ;* the latter at the *common law.* And even when both have assumed the *civil law* as the starting point, they have diverged to directly opposite conclusions. The rules which the former have deemed it their duty to adopt, are most unfavorable to the rights of private property. Those by which our courts of justice have been guided, are more favorable, because dictated by the benign spirit of the common law. If the former be right, a large sum of individual suffering and ruin must be the consequence. With the utmost deference to that very able and respectable board, we must be permitted to doubt the soundness of their legal positions, when we see them overruled by the decisions of the high superintending jurisdictions of our country ; and especially when we see those decisions so plainly supported by the sainted doctrines of a *Hale,* a *Holt* and a *Mansfield.*