## THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, APPELLANT, v. HENRY HART AND WILLIAM REMSEN, RESPONDENTS.

*Grant of land bounded by river — when it runs to low-water line — Lands under water — sale of, by the City of New York — need not be at auction after advertisement — meaning of adjacent owner.*

By the patent issued to the village of Harlem, in 1666, the property was described as extending "eastward to the end of the town, and Harlem Ryver, or any parte of the said Ryver on which this island doth abutt, within the lymitts aforementioned," etc.

*Held,* that considering that the grant was to a town, and not to an individual, and that retaining the land between the high and low-water lines would be of no practical advantage to the grantors, while the right to the use and enjoyment of it was indispensable to the trade and prosperity of the village; and considering all the other circumstances of the case, the grant should be construed to extend to the low-water line.

The sale of lands under water, by the city of New York, is not subject to the restrictions imposed upon the sale of corporate property by section 105 of chapter 137 of 1870, and section 13, title, 4 of the Sinking Fund ordinance of February 22, 1844, but such lands are to be sold in pursuance of section 11 of title 4 of the said Sinking Fund ordinance of February 22, 1844.

The term "adjacent owner," as used in the act to designate the persons entitled to purchase lands under water, is not limited to the owner of the land lying next to it, e. g., the owner of the land between high and low-water line, but means the owner of the upland which is bounded by the river.

APPEAL from a judgment in favor of the defendant, entered upon the trial of this action by the court without a jury.

This was a suit in ejectment, brought to recover a tract of land on and under the Harlem river, within the city of New York, extending from near the Third avenue to a short distance beyond Lexington avenue. On the 19th day of March, 1870, defendants petitioned the commissioners of the sinking fund for a grant of the premises, the subject of this suit, and on reference to the comptroller and street commissioner, they reported in favor of giving the defendants a grant of the premises for the consideration of $1,700, and the grant was accordingly given. There was no sale at public auction or public advertisement of such sale. The property was between high and low-water mark and below low-water mark

on the Harlem river, a navigable river in which the tide ebbs and flows. The defendants, in answer, deny plaintiff's title ; claim title in themselves under conveyances from plaintiff and others, and that they have been in possession, through themselves and their grantees, adversely to the plaintiff for more than twenty years prior to the commencement of this action, and set up the grant from the city to them as an estoppel.

*I. S. L. Crimmins* and *Charles Matthews*, for the appellant.

*Clarkson N. Potter*, for the respondents.

DANIELS, J. :

This action was brought to recover possession of land outside of the high-water line of the Harlem river, and between that and the exterior line established by chapter 285 of the Laws of 1852. A deed of this land was executed and delivered by the plaintiff to the defendants on or about the 21st day of June, 1870 ; but the plaintiff assails the validity of this deed, because it was executed and delivered without any previous public notice of the sale of the property. The defendants applied for its purchase to the commissioners of the sinking fund of the city of New York, for the reason that they owned the land directly south of it, a portion of which was bounded by the Harlem river, and the residue had in terms been conveyed to them by a deed extending the line to the low-water mark. In support of the title which the deed from the plaintiff was intended to convey the original patents to the inhabitants of Harlem have been given in evidence in the case, for the purpose of extending their previous right in the property to the low-water line of the river. These patents, so far as their consideration has become necessary in this case, were made and delivered in May and October in the year 1666, for that which followed them in 1668 was merely confirmatory of the preceding grants. By these two prior patents the lands described, and the privileges mentioned in them, were given and granted to the freeholders and inhabitants of what is stated to have, at that time, become the town or village of New Harlem, and by the first the property and privileges granted were declared to extend east-

erly to the town and Harlem river. This description was evidently considered too indefinite and obscure to subserve the purposes intended to be promoted by the grant, for by the patent succeeding this, and issued on the 11th of October, 1666, the property and privileges granted were in terms extended "eastward to the end of the town and Harlem ryver, or any parte of the said ryver on which this island doth abutt, within the lymitts aforementioned, described, doth and shall belong to the said towne * * * * together with all the soils, creeks, quarries, woods, meadows, pastures, marshes, waters, lakes, fishing, hawking, hunting and fowling, and all other profits commodityes, emoluments and hereditaments to ye said lands and premises within ye said bounds and lymitts sett forth belonging or in anywise apperteyning." By this patent the grant made to the village or town was extended to the river, but whether to high or low-water line was not in terms stated. Ordinarily, a grant made and limited by such a reference would end at the high-water line, as the river mentioned was not only navigable, but also affected by the ebb and flow of the tides. But a consideration of the circumstances existing at the time of, and under which these patents were issued, and which, as well as their language, may be allowed to affect their construction (*Knapp* v. *Warner*, 57 N. Y., 668), and the purposes they were designed to advance, appear to suggest the propriety of a different rule for the interpretation of these instruments.

The intent of the patents must be ascertained in order to determine the point on the river by which they should be bounded; and as that may be gathered from their terms, and the circumstances then existing by which those terms were necessarily affected, it must be maintained as controlling over the case. (*Canal Co.* v. *Hill*, 15 Wallace, 94.) The grants made by these patents were not to individuals, but to a town or village whose prosperity and growth had attracted the attention of the colonial governor. An element of that prosperity must have been its facilities for prospective trade and commerce; and as that prosperity was evidently intended to be advanced by the grants made, those facilities could not have escaped the notice of the granting authority. The controlling and paramount purpose of the patents

was evidently to place the town or village in the position previously maintained by the colonial authority, and that could only be done by extending its proprietary rights as far into the river as should be considered necessary for the development of the commercial advantages of the place. No good reason exists for the supposition that the colonial governor intended to confer on the village the title to the high-water line, and to retain and withhold all that was beyond it, when, without that, the inhabitants whose interests as a community were to be promoted would be excluded from the possibility of enjoying the commercial advantages of their immediate vicinity. Retaining the land between the high and low-water lines would be of no practical advantage to the granting authority, while its right and enjoyment would be indispensable to the prosperity of the village which had then become a community of importance. A grant from the public authorities to individuals would undoubtedly require a different construction. (*Ex parte Jennings*, 6 Cow., 518.) But the language, purposes and the circumstances affecting these patents appear to require a broader construction. They were executed to donate to the village or town the lands undisposed of, lying within the prescribed bounds, to subject them to its authority, and contribute them to its improvement and the advancement of its interests. That could only be done by giving it the unrestricted benefit of its water front, and its exclusion would not be consistent in the least with the probable design and purpose of the grants. This has been made manifest by the terms used, for they are of the most general nature, and these are followed by such special enumerations as show that it was the intent to give to the village all that the colonial governor had the power to bestow within its limits, as they were declared. The object plainly was to confer the title to the territory which it was deemed useful for the village to own, and the water-front constituted a most important attribute of that territory. It was, in terms, the grant of the undisposed village site, with its adjacent water, and whether made by patent or by legislative authority, it would be little less than absurd to suppose that it was the intent to exclude the inhabitants from the privileges of those waters. A prominent purpose in the establishment of such a community is that of trade and commerce by means

of the contiguous waters, and conferring the territory required for its existence must be ordinarily intended to include that of the promotion of this purpose ; beside that the waters appertaining to the bounds and limits set forth were in terms given by the patents, and the waters of this river were certainly included within these terms, as well as those extending the grant as far as the island abutted.

The succeeding governor Dongan, by his patent of March 7, 1686, confirmed those made by his predecessor in office; and when, in the succeeding month of April, he conferred the original charter on the mayor, aldermen and commonalty of the city of New York, he apparently had these patents in his mind, for it was only in the lands which were then unpatented that he granted that which laid between the high and low-water lines to the city. The description given was in the nature of a saving clause, by which the land between the high and low-water lines was declared not to be included in the grant then made, when it should be found to appertain to what had been previously donated by public patents, as this land had been.

· Under these instruments, as they should be construed in order to give effect to, and carry out the evident designs of the granting power, the land should be held to have been conveyed to the village as far as low-water mark, and that of itself will prevent the plaintiff from recovering in the case for that reason to that extent, even though the defendants have not succeeded, by the conveyances through which their title has been derived, in acquiring the title to it, for title out of the plaintiff is a complete defense in an action of this nature. But as this line does not include all the land claimed in this action by the plaintiff, it will still be necessary to examine the grounds on which the objection has been placed to the validity of the deed received by the defendants from the plaintiff. This depends very much upon the prohibition contained in the charter of 1870, which was in force when this deed was executed. By that it was provided that "all property sold under the authority of the common council shall be sold at auction after previous public notice, under the superintendence of the appropriate head of department." (Laws of 1870, ch. 137, § 105, vol. 1, p. 392.) Similar provisions had before existed which were repealed by this

act of 1870. (Laws of 1853, ch. 217, § 7, vol. 1, p. 411; Laws of 1857, ch. 446, § 41, p. 888.) But they did not include lands of the description of that claimed in this action. For all lands under water were excepted by these acts from the provisions requiring previous public notice of sale ; and the owners of what were designated the uplands were recognized as possessing a pre-emptive right to become the purchasers of the lands under water. (Id.) This was distinctly indicated by both the acts of 1853 and 1857, which, however, were repealed in 1870. (Laws of 1870, ch. 137, § 120, vol. 1, p. 396.) And chapter 285 of the Laws of 1852, so far as it related to this subject, proceeded upon the same policy that had been adopted before the passage of either of these acts, and it was not in terms changed by the act of 1870. As to property of this description it was also the theory of the ordinance of the common council for the creation of the sinking fund, passed on the 22d of February, 1844; and as to that ordinance it was afterward provided that it should not be amended without the consent of the Legislature first had and obtained, except by setting aside additional revenue, but that it should remain in force until the Croton water debt should be fully redeemed. (Laws of 1845, ch. 225, § 5, p. 248.) And as no change in this provision has been made the ordinance still continues as one of the permanent and existing laws of the city. By that it was provided that the commissioners of the sinking fund, whose functions and authority were left unchanged by the charter of 1870 (Laws of 1870, ch. 137, § 116, p. 395), were authorized to sell and dispose of all real estate belonging to the corporation, and not in use or reserved for public purposes. But the sale was required to be by auction, and on at least twenty days previous notice, containing a description of the property, published in each of the newspapers employed by the corporation. (Section 13, title 4 of Sinking Fund Ordinance.) This provision, and that contained in section 105 of the charter of 1870, were all that existed, requiring public notice to be given of the sale to be made, when the defendants received their deed. The one in general terms included all property of the corporation to be sold, and the other all its real estate ; but neither of these phrases were designed to include this land, although it might be properly included within the terms real estate, or property, for the reason

that the sinking fund ordinance had specially characterized it not simply as property, or real estate, but as lands under water ; and, as lands under water, a particular and different mode had been prescribed for its disposition. That was to be done by an estimate of its value by the comptroller and street commissioner of the city, an agreement to that valuation by at least a majority of the sinking fund commissioners, and a grant for that price " to the parties who may legally be entitled to the same." (Title 4, section 11, Sinking Fund Ordinance.) This was all that was required to be observed in order to make a valid sale of land under water ; and as to land of that description the ordinance in terms assumed that there were parties legally entitled to become its owners. By that could be intended no others than the persons whose land abutted, as the defendants' did, upon the river; and, in that respect, it was conformable to the general policy of the State concerning the disposition of lands under navigable water. (1 R. S. [5th ed.], 552, § 82.) It is entirely obvious, for that reason, that the requirement of previous public notice could have no application to sales of such lands, for no advantage whatever could be derived from it, as there was no room for competition. This assumption of the ordinance, that there were persons legally entitled to acquire this property, was sanctioned by the acts of 1853 and 1857, as already mentioned ; for as to lands under water, the owners of the uplands, as they were called, were acknowledged to have a pre-emptive right to acquire the title to them. That was in terms preserved for the same class of persons, under the description of adjacent owners, by the act of 1852. For whether called the owners of the uplands or adjacent owners, the same persons must have been referred to, for the reason that all the legislation on this subject was without doubt intended to be uniform. (Laws of 1853, ch. 217, § 7, vol. 1, p. 411; Laws of 1857, ch. 446, § 41, p. 888; Laws of 1852, ch. 285, p. 421, § 4.) This was a just and equitable policy for the disposition of this description of property, and it could not have been intended that it should be abrogated by the subsequent section of the same ordinance, declaring in general terms the manner in which the real estate of the city must be sold, or by the provisions of the charter of 1870, relative to the sale of corporate property. These provisions, though sufficiently general in their terms to include all lands under

water, if they had been left unqualified and alone should, because of the special provisions prescribing in detail the mode in which such lands were to be sold and conveyed, be so restricted as not to include lands under water.    That this should be so is evident from the fact that the two provisions are contained in the same ordinance.    It could not for that reason have been intended by the later to have superseded the earlier one.    Then it was confirmed as enacted, and it has never been amended in this respect either by the Legislature or the common council, acting as it has been required alone to act concerning this ordinance, by legislative authority, and being a special provision relating to a peculiar subject, it could not have been intended to affect or qualify it by so general a provision as was made for the sale of corporate property by the charter of 1870.    (*Matter of Comm'rs of Central Park*, 50 N. Y., 498 ; *People* v. *Quigg*, 59, id., 83, 88.)    But as both certainly, without any inconsistency may, they both should be maintained and enforced together.    (*Mongeon* v. *People*, 55 N. Y., 613, 616–617.) The first as declaring the mode in which land under water could be properly sold without public notice, while all the other salable property of the city should be first advertised to secure competition. Construed in that manner, the conveyance in controversy was lawfully made, for if that part of the land which was between the high and low-water lines ever belonged to the city, the manner in which it should be sold and conveyed was regulated by the sinking fund ordinance ; while that and the act of 1852 conferred the like authoritity to dispose of and convey what was beyond the low-water line.

It has been urged that this act should be so construed as to include within the pre-emptive privilege only the proprietor of the land lying next to it ; but if the act should be so construed, and the city owned the land between the high and low-water lines, the conveyance of that which laid beyond could only run to itself. No such intention animated the law ; for the property was by the act given to, and was to be conveyed by, the city to some other adjacent owner or owners, who could be no other than the proprietors of what the other acts designated the uplands, and they, though repealed, may still be referred to as subsequent legislative expositions of the understanding existing concerning the significa-

tion of the term adjacent owners ; for the same intent must have induced and pervaded all the legislation on this subject. By adjacent owners, must, therefore, have been intended those whose lands were bounded by the river. The same class of persons were referred to who were entitled to the lands under water, as that had been expressed by the ordinance. If that were not so, then the absurdity would exist of providing by law for the sale of the land between the high and low-water lines to one person, and that outside of it to another, which would necessarily very much diminish the practical value and importance of both.

But even if that extreme position were sanctioned the defendants did still become entitled to the land vested in the city by the act of 1852 ; for as the land between the high and low-water lines was lawfully sold to them by virtue of the provisions contained in the ordinance, that strictly created them adjacent owners to the other, and entitled them to the full benefit of the pre-emptive privilege. By acquiring the right to a deed of the first they became literally owners adjacent to the other. One was lawfully sold under the sinking fund ordinance, and the other under the authority of the act of 1852, and by neither was any public notice required to be given. It was dispensed with by the ordinance as to the land between the high and low-water lines, and by the statute as to the land affected by its own provisions. The design of both upon this subject was reasonably apparent, and it was observed in the disposition of this property, and it could be all properly sold by one contract, and one deed, as it was to be done in the same way, even if the plaintiff, and not the village of Harlem, should be held to have acquired title under its first charter to so much as was included by the high and low-water lines of the Harlem river. The statute required no such notice for the sale of the lands donated by its authority beyond the low-water line; neither did the sinking fund ordinance, for that which was inside of it, and between it and the high-water line.

This was evidently the clear understanding of the authorities acting in behalf of the plaintiff, and of those engaged in the subsequent improvement of the locality, for they have taxed this land as the private property of the defendants, and assessed it for the improve-

ments made in its vicinity, and those taxes and assessments have been paid by the defendants as its owners. This, though not conclusive, is very clear evidence of the existence of a general understanding that the property had been legally obtained by the defendants.

It has not been claimed that the second section of chapter 121 of the Laws of 1855, declaring that no grants of land under water should afterwards be made until further directed by the Legislature, in any respect affected this case, and it probably could not have been consistently, for that prohibition extended no farther than the lands the commissioners were required to report upon, and their duties were restricted to what was termed the harbor of the city of New York. This locality does not appear to have properly formed any part of that harbor, as it was there intended to be referred to, and for that reason should not be held to be bound by the restriction imposed.

It has been urged that the use made of the portion of the land between the high and low-water line had created a title to it by adverse possession, but the acts shown were not of that exclusive nature as would justify the position taken upon them. There was no such occupancy, enclosure, or claim of title as the law required to create an adverse possession.

But as the sale conformed to the regulations adopted for the disposition of lands under water, and under them, and the provisions of the act of 1852, the conveyance was valid, the plaintiff was rightly held to have failed in its action, even though it and not the town, or village of Harlem, became the owner of the land between the high and low-water lines.

The judgment in the case was proper, and it should accordingly be affirmed.

INGALLS, P. J., and POTTER, J., concurred.

Judgment affirmed.